UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. 22-cr-00087 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| MICHAEL J BANIEL | MAGISTRATE JUDGE HORNSBY |

**REPORT AND RECOMMENDATION**

**Introduction**

Michael J. Baniel ("Defendant") is charged with one count of possession with intent to distribute methamphetamine, fentanyl, and marijuana. The charges arise out of a traffic stop and subsequent search of Defendant's vehicle. Before the court is Defendant's Motion to Suppress (Doc. 28). Defendant argues that the traffic stop violated his Fourth Amendment rights and that all evidence and statements obtained as a result of the traffic stop should be suppressed. For the reasons that follow, it is recommended that the motion be denied.

**Relevant Facts**

A hearing was held on the motion to suppress. The following facts were established. On March 14, 2022 at approximately 1:00 a.m., Trooper Colton Derrick with the Louisiana State Police was on patrol on I-220 near Bossier City. Tr. 9. Derrick was parked on the shoulder of the interstate. He saw a Red Ford Edge traveling eastbound. The Edge suddenly decreased its speed when it approached Trooper Derrick's vehicle. Derrick estimated that the vehicle was traveling at 60 miles per hour, but the driver suddenly slowed

to about 50 miles per hour when he saw Derrick's vehicle. The speed limit in the area was 60 miles per hour. Tr. 10. As the vehicle passed Derrick, it drifted to the left causing its left side tires to touch the white dashed line. Tr. 12.

Derrick entered the interstate and caught up to the Edge. As he approached the vehicle, which was still traveling at approximately 50 miles per hour, the vehicle drifted to the left and its left side tires touched the white dashed line. Derrick decided to conduct a traffic stop on the vehicle for improper lane usage. Tr. 12.

Derrick activated his lights. The Edge immediately jerked to the shoulder and came to a sudden stop. Derrick thought this was unusual because people usually pull over gradually and come to a controlled stop. Tr. 13. The Edge stopped with its left side tires close to the fog line. Derrick testified that drivers will sometimes do that on purpose so that law enforcement will be distracted by the oncoming traffic. Tr. 14.

Derrick exited his vehicle and approached the passenger side of the Edge and saw a suitcase in the car. Defendant, who was driving the vehicle, was retrieving documents. Derrick could see that Defendant's hands were shaking as Defendant rolled down the window. Tr. 15. Derrick attempted to speak to Defendant first, but Defendant cut him off with an unsolicited story about a broken window on the Edge. Tr. 16. Defendant explained that he had just recently purchased the vehicle. It was overheating, so Defendant stopped at a truck stop. Defendant got locked out of the vehicle and had to break the window in order to get back inside of it. Tr. 17.

Defendant gave Derrick his driver's license, the salvage title for the vehicle, and a handwritten bill of sale. Tr. 18. The bill of sale indicated that Defendant purchased the

Edge from Giselle Marisol Monzon on March 12, 2022, but it did not include a sale price. Tr. 20, 24. The salvage title was in Ms. Monzon's name. Tr. 20. Defendant told Derrick that he purchased the vehicle in California one or two days prior to the stop. Tr. 21-22.

Derrick explained that he stopped Defendant for swerving over the white dashed line twice and that he wanted to make sure Defendant was not intoxicated or impaired. Tr. 22. Defendant apologized for swerving. He again made unsolicited statements about the broken window and about his purchase of the vehicle. Tr. 22-23. Defendant stated that he was having transmission problems with his previous vehicle and that it would cost $5,000 to get the transmission fixed. He found an ad for the Edge on Facebook Marketplace for $6,000, so he flew to California to pick it up and drive it back to Alabama. Tr. 25.

Derrick was concerned because Defendant admitted to breaking the window, and the only official documentation on the vehicle was the salvage title in someone else's name. Tr. 23. The handwritten bill of sale could have been written by anyone, and it did not appear official because it did not include a sale price. Tr. 24. The vehicle registration had not been transferred to Defendant's name, even though Defendant had spent a few days in California to complete the purchase of the vehicle. Tr. 28. During the conversation, Defendant was sweating and trembling, and his answers to Derrick's questions about his trip were long-winded and over-explanatory. Derrick recognized these as signs that Defendant was being deceptive. Tr. 26.

Derrick returned to his patrol car and asked dispatch for a criminal history and driver's license check on Defendant. Tr. 29. He filled out a consent to search form and called for backup from two other troopers. Troopers Cahn and Wardell arrived at the scene.

Derrick exited his vehicle and asked Defendant to step out of his vehicle and stand at the rear of the Ford Edge. Tr. 32. Derrick explained to Defendant that he routinely investigates crimes such as narcotics smuggling, firearms smuggling, and human trafficking on the interstate, and Defendant became agitated and confrontational. Tr. 33. Derrick asked Defendant for consent to search the vehicle, and Defendant refused. Tr. 33.

Derrick had Troopers Cahn and Wardell stand with Defendant while Derrick retrieved his K9, Migo, from his patrol car. Tr. 38. After making two passes around the vehicle, Migo alerted to the driver door area of the vehicle. Tr. 40. Derrick informed Defendant that the K9 had made a positive alert, and Defendant became more agitated and aggressive. Tr. 40.

Cahn stood with Defendant while Derrick and Wardell searched the vehicle. Tr. 40. As they were searching, Cahn yelled that Defendant was running. Defendant ran towards the wood line and tried to jump over a barbed wire fence. The troopers chased him, and Wardell tased Defendant. The troopers took Defendant into custody and placed him in the back of one of the patrol units. Tr. 41.

Trooper Wardell searched Defendant's vehicle and told Derrick that there were drugs in the vehicle. Tr. 47. Inside a hard shell suitcase in the vehicle were two green packages that contained marijuana and brown packaging containing methamphetamine and fentanyl. Tr. 50.

**The Motion to Suppress**

Defendant asserted in his original motion to suppress that the traffic stop was not justified at its inception. However, in his post hearing brief, defendant does not challenge

the legality of the stop or the search of the vehicle. Instead, he argues only that the stop was unreasonably extended without reasonable suspicion to believe that Defendant was engaged in criminal activity. Defendant argues that all evidence seized as a result of the extended stop should be suppressed.

**Law and Analysis**

"The reasonableness of traffic stops and investigative detentions of motorists who are suspected of criminal activity is analyzed under the framework established in Terry v. Ohio, 392 U.S. 1 (1968)." United States v. Rosales-Giron, 592 Fed. Appx. 246, 250 (5th Cir. 2014); quoting United States v. Stevens, 487 F.3d 232, 244 (5th Cir. 2007). "Under Terry, we determine the reasonableness of an investigative stop by examining: (1) whether the officer's action of stopping the vehicle was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop." Id. Only the second Terry prong is at issue here.

An officer's actions are not reasonably related if the officer detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless the officer develops reasonable suspicion of additional criminal activity in the meantime. United States v. Brigham, 382 F.3d 500, 506 (5th Cir. 2004) (en banc). If the officer develops reasonable suspicion of additional criminal activity during the investigation of the circumstances that originally caused the stop, the officer may further detain the occupants for a reasonable time while appropriately attempting to dispel this reasonable suspicion. Id.; United States v. Aguilera, 2014 WL 7404535, at *3 (N.D. Tex.).

An officer may examine driver's licenses and vehicle registrations and run computer checks as part of the investigation of the circumstances that originally caused the traffic stop. United States v. Pack, 612 F.3d 341, 349-350 (5th Cir. 2010). The officer may also ask about the purpose and itinerary of the occupant's trip as part of this investigation, because these questions are considered to be reasonably related in scope to the investigation of the circumstances that caused the stop. Id. An officer may ask questions on subjects unrelated to the circumstances that caused the stop, so long as the unrelated questions do not extend the duration of the stop. Id.

Trooper Derrick had reasonable suspicion to believe that Defendant was engaged in criminal activity. Derrick testified at the hearing that Defendant was shaking, sweating, and trembling at the beginning of the stop. Tr. 26. When Derrick inquired as to the reason for the trip or purchase of the vehicle, Defendants responses were long, rambling, and nonsensical. Tr. 26. Defendant state that his reason for the trip was to purchase a vehicle because the transmission on his vehicle was broken. This required Defendant to pay for airfare, stay in California for a few days, then drive back to Alabama. Derrick found it suspicious that Defendant would do that rather than fix his transmission. Tr. 25. Defendant indicated that he was in California for a few days to complete the purchase of the vehicle, but he had not changed the vehicle registration to his name while there. Tr. 28. The title was still in the previous owner's name, and the handwritten bill of sale was suspicious because it did not include the sale price. Tr. 24.

Derrick made these observations prior to running the routine checks associated with the traffic stop. Based on the totality of the circumstances, Derrick had reasonable

suspicion to believe that Defendant was engaged in criminal activity. Thus, it was reasonable for Derrick to extend the traffic stop to investigate further, which led to the K-9 alert and the discovery of the drugs.

Accordingly,

It is recommended that Defendant's Motion to Suppress (Doc. 28) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b). A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 2nd day of February, 2023.

Mark L. Hornsby
U.S. Magistrate Judge